## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES M. CAVANAGH | : | CIVIL ACTION |
| ROSEANNE SCULLY CAVANAGH, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ELECTROLUX HOME PRODUCTS, | : | No. 10-2890 |
| Defendant. | : | |

### MEMORANDUM OPINION

**TIMOTHY R. RICE**                                    **October 17, 2012**
**U.S. MAGISTRATE JUDGE**

        Plaintiffs Charles M. Cavanagh and Roseanne Scully Cavanagh have sued Defendant

Electrolux Home Products for negligence, breach of warranties, strict liability, and interference

with their right of peaceful enjoyment of their real property.  Electrolux now seeks summary

judgment.  For the following reasons, Electrolux's motion is denied on the counts of negligence

and strict liability and granted on the counts of breach of warranties and interference with

plaintiffs' right of peaceful enjoyment of their real property.[1]

I.        <u>Background</u>

        In 1998, the Cavanaghs purchased a Kenmore dehumidifier (the "Dehumidifier")

designed, manufactured, and distributed by Electrolux.[2]  <u>See</u> 6/16/2012 R. Cavanagh Dep. at 29

(Ex. A to Def.'s Mot. for Summary Judgment (doc. 42-3), Ex. B to Pls.' Resp. (doc. 48-5)); Am.

---

[1]        The Cavanaghs consent to the dismissal of their breach of warranties claim.  <u>See</u> Pls.'s
Bf. in Support of Resp. to Def.'s Mot. for Summary Judgment (doc. 48-2), at 1.  Summary
judgment is granted on that claim (Count V in the Amended Complaint) without further
discussion.

[2]        I have viewed the facts and any inferences from those facts in the light most favorable to
the Cavanaghs.  <u>See</u> <u>Ray v. Warren</u>, 626 F.3d 170, 173 (3d Cir. 2010).

Compl. ¶ 3  (doc. 15).   That same year, the Dehumidifier was mounted in a wall cut-out in the basement of the Cavanaghs' home in Berwyn, Pennsylvania.  See 6/16/2012 R. Cavanagh Dep. at 33-34, 61-62.  The Dehumidifier remained in that location and worked without problems for approximately twelve years.  See id at 70, 94.

Around 9:00 a.m. on May 12, 2010, Mrs. Cavanagh turned on the Dehumidifier and left it running all day.  See id. at 114-15.  Mrs. Cavanagh left the house around 6:00 p.m. and returned around 7:45 p.m. to see smoke coming from the back of the house.  See id. at 115-22. Shortly thereafter, the fire department arrived and extinguished the fire.  See id. at 130-31.

Reports prepared by the Radnor Township Fire Marshal and the Pennsylvania State Police state that the fire originated in and around the Dehumidifier.  See Radnor Twp. Fire Marshal Report (Ex. A to Pls.' Resp. (doc. 48-4)), Pa. State Police Fire Investigation Report/Worksheet (Ex. C to Pls.' Resp. (Doc. 48-6)).  According to the Radnor Township Report, "the ignition factor was a failure in the dehumidifier [although] we were unable to determine whether it was an electrical or mechanical failure."  The Pennsylvania State Police Report states: "investigators believe that there was some type of electrical breakdown or mechanical failure of the dehumidifier."

II.    Discussion

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id. Where there is only one reasonable conclusion from the record regarding the potential verdict

2

under the governing law, summary judgment must be awarded to the moving party.  See id. at

250.  "If reasonable minds could differ as to the import of the evidence, however, a verdict

should not be directed."  Id. at 250-51.

A.      Negligence - Count IV

To establish negligence, a plaintiff must show: (1) a duty or obligation recognized by

law, requiring the defendant to conform to a standard of conduct; (2) the defendant's failure to

conform to that duty, or breach; (3) a causal connection between the defendant's breach and the

plaintiff's injury; and (4) actual loss or damage by the plaintiff.[3]  See Atcovitz v. Gulph Mills

Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002).  In a product defect case, a plaintiff must

establish the second and third elements of this test by showing her injury was proximately

caused by "a specific defect in the manufacture or design of a product."[4]  Brandon, 34 A.3d at

110; see also MacDougall v. Ford Motor Co., 387 A.2d 676, 678 (Pa. Super. 1969) ("[A]

plaintiff asserting liability on grounds of negligence must connect injury with a specific defect in

the manufacture or design of a product."), overruled in part on other grounds by REM Coal Co.,

Inc. v. Clark Equip. Co. 563 A.2d 128 (Pa. Super. 1989).  This burden is necessary "because

[negligence] liability hinges upon whether the accident could have been avoided by the exercise

of reasonable care."  Brandon, 34 A.3d at 110; see also MacDougall, 387 A.2d at 680.

---

[3]      As the parties agree, Pennsylvania substantive law applies to the Cavanaghs' claims.  See
Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (federal court sitting in diversity
must apply state substantive law).

[4]      Where the doctrines of res ipsa loquitur or exclusive control are applicable, the plaintiff
does not have to make this showing.  See Brandon v. Ryder Truck Rental, Inc., 34 A.3d 104, 110
(Pa. Super. 2011).  Neither party claims these doctrines apply here.

The Cavanaghs have produced an expert report from Michael E. Wald, an electrical engineering consultant from IEI Consulting, who opines the Dehumidifier's defrost thermostat was defectively manufactured:

> [I]t is the conclusion of IEI's investigation, to a high degree of scientific certainty, that the cause of this fire was the catastrophic failure of a defectively manufactured defrost thermostat.

IEI Consulting Rpt, 2 (Ex. E to Pls.' Resp.).  Wald explains a default thermostat may degrade and fail because of:  (a) a "slight misalignment of the switch contacts" or (b) insufficient "contact pressure" placed on the contacts "when the switch is manufactured."  Id. at 2.  He states:

> The defrost thermostat in this humidifier is basically a switch that responds to temperature.  In this particular design the defrost thermostat is directly in the circuit supplying operating power for the compressor and is thus subjected to the full load current of the compressor when the switch opens and closes (cycles).  If properly manufactured this thermostat will dissipate heat properly during each of these cycles and operate reliably for at least the useful life of the product - 15 to 20 years.  However if there is some slight misalignment of the switch contacts or the contacts do not have sufficient contact pressure when the switch is manufactured then excess heat will be created as the switch cycles and this component will gradually degrade.  Over a period of years this degradation will get worse and worse until ultimately the integrity of the switch will be so badly compromised that the switch components will begin arcing and erode the structure of the switch until the internal components arc to the metal case of the thermostat itself.

Id.  Wald further explains the degradation of the defrost thermostat can produce large amounts of molten metal, which can ignite plastics within the dehumidifier, causing a fire:

> Because this component is operated at 120 volts and there is no upstream overcurrent or ground fault protection, the failure of the steel case can produce large amounts of molten metal.  Molten steel has a temperature of over 2800 degree Fahrenheit.  Plastics within this dehumidifier which are located just below this thermostat will ignite at temperatures of about 800 degrees Fahrenheit.  Thus it is quite easy for arcing failures such as occurred in this appliance to ignite the appliance.

Id.  Wald also opines that Electrolux could have manufactured or designed the Dehumidifier

differently to protect it from igniting:

> [D]esign and manufacturing practices such as component isolation and ground-
> fault-circuit interruption were readily available when this product was
> manufactured and incorporating either of these practices would have prevented
> the pre-mature failure of this component from igniting a fire.  Alternate designs
> using timed defrost cycles and low voltage sensors and relays to control the
> cycling of the compressor power were also available at the time this product was
> manufactured and were commonly used to reduce the risk of fires from failed
> components.

Id.

Electrolux asserts Wald's report is insufficient to sustain the Cavanaghs' negligence

claim because although Wald has identified the defrost thermostat in the Cavanaghs'

Dehumidifier as the source of the fire, he fails to identify a specific manufacturing or design

defect in that thermostat.  Rather, according to Electrolux, Wald only suggests possible defects

in any defrost thermostat.  Electrolux contends Wald needs to be certain about the defect present

in the Cavanaghs' Dehumidifier.  I disagree.

A full review of Wald's report shows he is focused on the Cavanaghs' Dehmidifier and

its defrost thermostat.  See Stimmler v. Chestnut Hill Hosp., 981 A.2d 145, 157 (Pa. 2009)

(expert reports are to be read in their entirety).  His conclusion "to a high degree of scientific

certainty" is that the defrost thermostat in the Cavanaghs' Dehumidifier was defectively

manufactured, failed, and ignited the fire in the Cavanaghs' home.  See IEI Consulting Rpt, at 2.

Wald also identifies two potential manufacturing defects that could cause a defrost thermostat to

degrade and ignite a fire (either a slight misalignment of the switch contacts or insufficient

contact pressure on the switches).  Although he does not specifically reference the Cavanaghs'

Dehumidifier in his discussion of these defects, it is evident from his report and his conclusion

that his discussion relates directly to the defrost thermostat in the Cavanaghs' Dehumidifier.[5]

Wald additionally made this clear during his deposition where he explained that the "damage

pattern" present in the Cavanaghs' Dehumidifier "can only be created by either a misalignment

of the switch or a lack of contact pressure."[6]  9/19/2012 M. Wald Dep. at 48 (Ex. I to Praecipe to

Supplement Pls.'s Sur-Reply (doc. 60)).

  Wald's opinions as to the defect present in the Dehumidifier also are sufficiently definite

to withstand summary judgment.  He is certain that the defrost thermostat was the part in the

Dehumidifier that was defectively manufactured and failed.  See IEI Consulting Rpt. at 2; see

also Wald Dep. at 68, 71-72.  He also is certain that Electrolux could have implemented

alternative manufacturing and design practices to prevent a fire from igniting because of the

defrost thermostat's failure.  See IEI Consulting Rpt. at 2; Wald Dep. at 75-77.  These opinions,

when read in conjunction with Wald's belief that one of two manufacturing defects could have

caused a defrost thermostat to degrade and fail so as to ignite a fire, create a genuine issue of

---

[5]  The sentences proceeding and following Wald's discussion of the two potential defects
demonstrate that his discussion relates to the defrost thermostat in the Cavanaghs' Dehumidifier.
In the paragraph immediately preceding his discussion about the defects, Wald refers directly to
the Cavanaghs' Dehumidifier, stating "the subject dehumidifier was a model 253.583.00890."
IEI Consulting Rpt, 2.  He begins the following paragraph on defrost thermostats (quoted in parts
above) by stating: "The defrost thermostat in this humidifier is basically a switch that responds
to temperature."  Id.  His statements in this same paragraph about the possible manufacturing
defects in a defrost thermostat also refer back to that same dehumidifier: the Cavanaghs'
Dehumidifier.  See id. ("In this particular design the defrost thermostat. . . .  If properly
manufactured this thermostat will dissipate. . . .").  His final sentence in this paragraph likewise
shows that he has been referring to the defrost thermostat in the Cavanaghs' Dehumidifier:
"Thus it quite easy for arcing failures in this appliance to ignite the appliance."  Id.

[6]  Because Wald was deposed after briefing was complete on Electrolux's summary
judgment motion, the Cavanaghs filed a praecipe to add his deposition transcript as an exhibit to
their response.  During oral argument on the motion, Electrolux agreed the transcript should be
considered.

material fact as to whether there was "a specific defect in the manufacture . . . of a product" that could have been avoided by Electrolux through the exercise of reasonable care.  MacDougall, 257 A.2d at 678, 680.  Mandating more from the Cavanaghs is not required at this stage.[7]  See Fed. R. Civ. P. 56(a); see also Brandon, 34 A.3d at 110 (granting summary judgment because plaintiff did not present any "expert opinion as to what the specific cause of the pulling might have been") (emphasis added); MacDougall, 257 A.2d at 680 (noting expert's testimony that bearing on steering shaft was too tight and that "improper adjustments to the shaft would produce the precise steering aberrations experienced by appellees" supports an inference of a specific defect in the car's steering) (emphasis added).

       Summary judgment is denied as to the Cavanaghs' negligence claim.

       B.        Strict Liability - Count VI

       To prevail on a strict liability claim, a plaintiff must show (1) the product was defective; (2) the defect caused the plaintiff's injury; and (3) the defect existed at the time the product left the manufacturer's control.  See Barish v. KWI Bldg. Co., 980 A.2d 535, 542 (Pa. 2009).  For the first element, a plaintiff may show the product was defective by producing either (a) "direct evidence of an alleged defect" (the "specific defect theory"), or (b) circumstantial evidence that the product malfunctioned along with evidence "eliminating abnormal use or reasonable, secondary causes for the malfunction" (the "malfunction theory").  Id.  As to the third element, prior successful use of a product does not necessarily mean the product was not defective at the

---

[7]     Although Electrolux also argues that Van Horn v. Reinhart Flynn, Inc., 62 Pa. D. & C. 4th 358 (C.C.P. Carbon Co. July 23, 2003) requires summary judgment here, that case is distinguishable because Van Horn did not present any expert testimony or offer any other proof as to a specific defect that may have caused the cruise control in the car at issue to fail.

time it left the manufacturer's control.  See id. at 546.  Where a plaintiff admits the product functioned properly in the past, however, that plaintiff can avoid summary judgment only if she "present[s] some evidence explaining how the product could be defective when it left the manufacturer's control and yet still function properly for a period of time."  Id. at 547 (also stating "a plaintiffs acknowledgment of prior successful use undermines the inference that the product was defective when it left the manufacturers control").

Electrolux primarily contests the Cavanaghs' ability to establish the third element: that a defect existed at the time the Dehumidifier left Electrolux's control.  Electrolux claims the Cavanaghs "have no evidence to support that a defect existed in the subject humidifier at the time the dehumidifier left Electrolux's control 11-12 years ago."  Def.'s Reply Bf. (doc. 51), 4-5.

Because Mrs. Cavanagh testified that she had no problems with the Dehumidifier before the fire, see 6/16/2012 R. Cavanagh Dep. at 94-95, the Cavanaghs need to present "some" evidence explaining how the Dehumidifier was defective when it left Electrolux's control and yet managed to function properly for 11-12 years.  See Barish, 980 A.2d 547.  Wald's report satisfies this requirement.  Wald explains that if there was a slight misalignment of the switch contacts or insufficient contact pressure on the switch contacts, the defrost thermostat "will gradually degrade" and "[o]ver a period of years this degradation will get worse and worse" until ultimately the switch components erode.[8]  See IEI Consulting Rpt., 2.  Such evidence creates a genuine issue of material fact as to whether the Dehumidifier was defective when it left

---

[8]       As in its argument concerning the Cavanaghs' negligence claim, Electrolux contends Wald's discussion about possible manufacturing defects in a defrost thermostat are deficient because he does not reference the Cavanaghs' Dehumidifier in this discussion.  As explained, however, a full review of Wald's report establishes he is referring to the defrost thermostat in the Cavanaghs' Dehumidifier.

Electrolux's control, even though it functioned properly for 11-12 years.  Only a jury can decide whether this issue has merit.

Electrolux also summarily argues that the Cavanaghs cannot establish strict liability because they have not eliminated abnormal use or other causes as reasons for the Dehumidifier's alleged malfunction.  See Def.'s Bf. in Support of Mot. for Summary Judgment (doc. 42-1), at 14.  Electrolux contends Wald failed to consider the Cavanaghs' failure to maintain the Dehumidifier or "possible damage to the dehumidifier when it was mounted in the wall" as causes for the Dehumidifier's malfunction.  Id.

Because the Cavanaghs have presented sufficient evidence to raise a question of material fact about whether there was a specific defect in the Dehumidifier, they may proceed on their strict liability claim solely under the specific defect theory without evidence eliminating abnormal use or other causes for the defect.  See supra at p.7 (explaining specific defect theory). Nevertheless, to the extent the Cavanaghs are proceeding under the malfunction theory as an alternative basis for establishing the Dehumidifier's defect, they have presented sufficient evidence for a jury to reasonably conclude that the Dehumidifier's failure was not caused by abnormal use or other adverse conditions.  See IEI Consulting Rpt. at 1 (stating there was an "unobstructed clearance both in front and behind the dehumidifier and no adverse conditions were noted which would have affected the reliable operation of these appliances," and the Dehumidifier "was always used in its intended manner"); Wald Dep. at 57-64, 79-80 (stating that the Dehumidifier's location and plaintiffs' failure to clean the product were not causes for its failure).

Summary judgment is denied as to the Cavanaghs' strict liability claim.

C.    Interference with Plaintiffs' Right of Peaceful Enjoyment of Their Real Property - Count VII

The Cavanaghs' claim for interference with their right of peaceful enjoyment of their real property is based on the private nuisance doctrine, which is governed under Pennsylvania law by Section 822 of the Second Restatement of Torts.  See Kembel v. Schlengel, 478 A.2d 11, 14 (Pa. Super. 1984); see also Waschak v. Moffat, 109 A.2d 310, 314 (Pa. 1954) (adopting Section 822 to determine private nuisance liability).[9]  Liability exists under Section 822 only if the contested "conduct is the legal cause of an invasion of another's interest in the private use and enjoyment of land."  Restatement (Second) of Torts § 822.  The invasion also must be either "(a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." Id.

Electrolux asserts the Cavanaghs' interference claim fails because a private nuisance theory of liability cannot apply to product liability claims.  According to Electrolux, this rule is evident by the "sheer absence of Pennsylvania precedent extending private nuisance law to product liability [claims]," Def.'s Bf. (doc. 42-1), at 18, and the use of private nuisance law in cases involving "conflicts between neighboring, contemporaneous land uses," Def.'s Reply Bf. (doc. 51) at 5.  Electrolux also cites City of Philadelphia v. Beretta U.S.A., Corp., 126 F. Supp. 2d 882 (E.D. Pa. 2000) (Schiller, J.), which held that a public nuisance theory was inapplicable to a product liability claim, and contends its reasoning supports dismissal of the Cavanaghs'

---

[9]    Although the Pennsylvania Supreme Court in Washak adopted the version of Section 822 that appeared in the First Restatement of Torts, Section 822 in the Second Restatement of Torts is substantively the same as what appeared in the First Restatement of Torts.  See Washak, 109 A.2d at 314; Restatement (Second) of Torts § 822; see also Kembel, 478 A.2d at 166 (holding Section 822 in the Second Restatement of Torts controls private nuisance liability).

private nuisance claim.

The Cavanaghs acknowledge private nuisance claims generally arise in cases involving neighboring landowners, but contend no law or policy prohibits a private nuisance claim from applying to a product liability claim involving non-neighboring parties if the elements of the claim are otherwise met.[10]  See Pls' Bf. in Support of Response (doc. 48-2) at 10.  The Cavanaghs also note Beretta was limited to public nuisance claims, which are distinct and separate from private nuisance claims.  See id. at 22-25 ("[P]ublic and private nuisance have entirely different legal standards.").  The Cavanaghs further assert Beretta is inapplicable because the case was based on non-defective products (guns) and the harm caused by the users of those products, as opposed to this case, which is based on an allegedly defective product and harm directly caused from the product.  See Pls.' Sur-Reply Bf. (doc. 53) at 8.

Because the Pennsylvania Supreme Court has not considered whether a private nuisance cause of action applies to a product liability claim, I must predict how the Court would decide this issue if it were before it.  See Pac. Emp'rs Ins. Co. v. Global Reins. Corp. of Am., Nos. 11-3224, 11-3262, 2012 WL 387158, *13-14 (3d Cir. Sept. 7, 2012).  I do this by looking at decisions by the Pennsylvania courts and federal courts interpreting Pennsylvania law, other state court decisions, and any other reliable information and data tending to show how the Pennsylvania Supreme Court would decide the issue.  See Norfolk S. Ry. Co. v. Basell USA,

---

[10]    During oral argument, the Cavanaghs acknowledged a private nuisance claim can only apply to product liability claims involving negligence by the product manufacturer.  They noted Section 822 of the Restatement allows for private nuisance liability for unintentional conduct only where the defendant's conduct is "otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities."  Restatement (Second) § 822.  By alleging a negligence claim against Electrolux, the Cavanaghs believe they have satisfied the elements for a private nuisance claim.

Inc., 512 F.3d 86, 91-92 (3d Cir. 2008).

In Washak, the Pennsylvania Supreme Court adopted Section 822 of the Restatement of Torts governing private nuisance causes of action, describing it as an "accurate and most comprehensive" view of the law.  109 A.2d at 448.  Applying the plain language of Section 822, the Pennsylvania Supreme Court concluded that the defendants were not liable for a private nuisance because although gases from their coal mining operations had invaded the plaintiff's interests on their neighboring lands, the invasion was "unintentional" and done "without negligence, recklessness or ultrahazardous conduct," as required by Section 822's terms.  Id. at 455.

Based on Washak, the Supreme Court of Pennsylvania would look primarily to Section 822 of the Restatement regarding private nuisance causes of action to decide whether such an action is proper here.  A defendant is liable for a private nuisance under that section only if its conduct was a "legal cause of an invasion of another's interest in the private use and enjoyment of land."  Restatement (Second) of Torts § 822; see also id. § 821D ("A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land.").  The term "invasion" is commonly understood to mean a "hostile or forcible encroachment on the rights of others."  Black's Law Dictionary  900 (9th ed. 2009); see also Webster's II New College Dictionary, 582 (2001) (defining "invade" as "to encroach upon"); Walker v. Ehlinger, 676 A.2d 213, 214-15 (Pa. 1996) (applying dictionary to determine term's meaning); 1 Pa. C.S. § 1921 (words in statute must be interpreted according to their plain meaning).  An invasion, therefore, occurs where a plaintiff's property interests have been encroached by something that has come onto the property against the plaintiff's will.  Here, the Cavanaghs voluntarily brought the Dehumidifier onto their property and kept it there for 12 years.  Such affirmative and

12

voluntary action cannot constitute an invasion, as required for a private nuisance cause of action in Pennsylvania.[11]

This conclusion also is supported by Pennsylvania and federal decisions limiting private nuisance cases to situations involving strangers to a premises or neighboring landowners.  See Dussell v. Kaufman Const. Co., 157 A.2d 740, 743 (Pa. 1960) (vibrations caused by defendant's pile-driving operations caused damages to plaintiff's neighboring property); Evans v. Moffat, 160 A.2d 465, 473 (Pa. Super. 1960) (plaintiffs' property invaded by "foul-smelling gases emanating from mine refuse dumps created" by defendant on a neighboring property); Waschak, 109 A.2d at 317-18 (homeowners' property invaded by gas emitted from neighboring coal mine); Cassell-Hess v. Hoffer, 44 A.3d 80, (Pa. Super. 2012) (neighbor's actions allegedly caused mosquito-infested standing water on edge of plaintiff's property); Kembel, 478 A.2d at 14-15 (defendants' neighboring transportation business allegedly invaded plaintiffs' use and enjoyment of their property); see also Harris v. Lewistown Trust Co., 191 A. 34, 38 (Pa. 1937) ("[t]he doctrine of condition amounting to a nuisance is confined to third persons or strangers to the premises, those 'either the owners or occupants of nearby property, persons temporarily on such property, or persons on a neighbouring highway or other public place"), overruled in part on other grounds by Reitmeyer v. Sprecher, 243 A.2d 395 (Pa. 1968); Phila. Elec. Co. v.

---

[11]     During oral argument, the Cavanaghs argued they would be left without a remedy if a private nuisance cause of action did not apply to their claims, and cited Houston v. Texaco, Inc., 538 A.2d 502 (Pa. Super. 1988), to support their right to a remedy for the loss of use and enjoyment of their property.  My role, however, is not to create a remedy where one is allegedly lacking, particularly when Pennsylvania law suggests that such a cause of action is inapplicable under the case's facts.  Houston also does not support allowing a private nuisance claim here. Although the Superior Court held that the plaintiffs could have recovered for their loss of use and enjoyment if properly pled, the facts in that case involved an "invasion," as defined by the Restatement.  Id. at 503 (plaintiff's well water was contaminated with gasoline derivatives that leaked from the neighboring defendant's service station).

Hercules, Inc., 762 F.2d 303, 314 (3d Cir. 1985) (private nuisance law was intended "as a means of efficiently resolving conflicts between *neighboring*, contemporaneous land uses") (emphasis in original); Magliano v. McDowell, No. 93 C 7216, 1995 WL 270565, at *5 (N.D. Il. 1995) (private nuisance can only be brought to recover damages from a neighboring landowner); Hanlin Grp., Inc. v. Int'l Minerals & Chem. Corp., 759 F. Supp. 925, 935 (D. Me. 1990) (private nuisance action lies "where the defendant's use of its land causes a continuing injury to adjoining or neighboring land").

Extending the private nuisance doctrine to encompass a products liability claim by a non-neighboring landowner is unsupported by Pennsylvania law or policy.[12]  Moreover, the Cavanaghs have not identified any law in Pennsylvania or elsewhere recognizing such a theory under similar facts.  Summary judgment is granted on the Cavanaghs' claim for interference with their right of peaceful enjoyment of their real property.

An appropriate order follows.

---

[12]     Beretta is mostly inapplicable to this case because the court was concerned with the rules governing public nuisances and whether a non-defective product could be a public nuisance under those rules.  Nevertheless, the Beretta court did refuse to allow a public nuisance cause of action to a product liability claim in the absence of any supporting Pennsylvania case law.  See Beretta, 126 F. Supp. 2d at 906 ("If I must choose between an interpretation of Pennsylvania law which reasonably restricts liability, and another which expands it, prudence dictates I choose the narrower path.").

14